# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| DIRECTV, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION |
| | § | |
| WNK ASSOCIATES, INC. a/k/a TRANS | § | FILE NO._____ |
| GLOBAL SERVICES a/k/a SWITCH 2 US | § | |
| a/k/a DTV PROMO, THE GREAT MILE, LLC, | § | |
| FDI TELECOM COMPANY, COMPLIANCE | § | |
| WHIZ INC., WALEED IQBAL, KHALID | § | |
| IQBAL, MOTASIM BILLAH, SHAHID | § | |
| BASHIR AHMAD a/k/a MUHAMMAD | § | |
| AHMAD, RANA T. REHMAN, AMNA | § | |
| JILANI, XYZ COMPANIES 1-10, and JOHN | § | |
| DOES 1-10, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff DIRECTV, LLC ("DIRECTV" or "Plaintiff") sues WNK ASSOCIATES, INC. A/K/A "TRANS GLOBAL SERVICES" A/K/A "SWITCH 2 US" A/K/A "DTV PROMO," THE GREAT MILE, LLC, FDI TELECOM COMPANY, COMPLIANCE WHIZ INC., WALEED IQBAL, KHALID IQBAL, MOTASIM BILLAH, SHAHID BASHIR A/K/A MUHAMMAD AHMAD, RANA T. REHMAN, AMNA JILANI, XYZ COMPANIES 1-10, and JOHN DOES 1-10 (collectively, "Defendants"), and states:

## BACKGROUND

1.      As a result of a months-long investigation, DIRECTV has identified perpetrators of the so-called Imposter Fraud Scheme.  This action seeks to terminate this ongoing fraudulent scheme being committed against DIRECTV and its customers by Defendants and their co-conspirators, and to compensate DIRECTV for damages caused by this fraud.

2.      DIRECTV sells personalized entertainment and video experiences to consumers through its satellite and streaming products and services. Over almost 30 years, DIRECTV has invested significant time and resources to develop into a household name. Since its launch in 1994 as the first direct-broadcast satellite system, DIRECTV has and continues to develop and update its technologies, programming, and customer experience, providing best-in-class services, content, and digital entertainment offerings. As a result, DIRECTV is the largest satellite television service provider in the country. This makes it a target for fraud, like that perpetrated by Defendants.

3.      Defendants and their co-conspirators are perpetrators of an unlawful scheme to enrich themselves by impersonating DIRECTV, contacting existing or potential DIRECTV customers to offer them nonexistent free or significantly discounted DIRECTV services or products, and then they take the consumer's money, typically in the form of prepaid gift cards, which they launder (hereinafter the "Imposter Fraud Scheme" or the "Scheme"). Defendants leave the consumer confused, angry, and without the promised free or discounted DIRECTV services or products, harming both consumers and DIRECTV.

4.      Defendants' Imposter Fraud Scheme, like most imposter fraud schemes, involves a number of steps and co-conspirators but follows the same pattern:

a.      Fraudsters identify actual and potential DIRECTV customers and consumers who may be in the market for digital entertainment services (*e.g.*, new homebuyers or those looking to install home entertainment systems). The fraudsters contact these consumers by text message or phone call using Voice Over Internet Protocol (VoIP) service, which allows them to manipulate their Caller ID, including to read "DIRECTV."

2

b.     When an individual responds, the fraudsters identify themselves as DIRECTV and tell the consumer that they have been selected for a special, time-sensitive promotion that DIRECTV is running, but the promotion is almost up, so the customer needs to act quickly.  Usually, the promotion is 50% off DIRECTV service for between 6-24 months, and sometimes they add in free premium channels.

c.     Once the consumer is convinced, the fraudsters elicit personal identification information, and, if the consumer is already a DIRECTV customer, they gather account access information.  The fraudsters then put the customer on hold while they use the identification information provided by the customer to unlawfully access their account, sometimes even adding premium channels to the account (at full cost) to add credibility to the fraud.

d.     The fraudster tells the customer that the promotion is in partnership with another company, often eBay, and, therefore, to reap the benefits of the dramatic discount, the customer will need to prepay the discounted amount in gift cards issued by the promotion partner.  The customer is provided a total amount for the gift cards, another number to call with the gift card information, and the fraudster's "employee number."

e.     The customer rushes out to buy gift cards, calls the number provided by the fraudster, which is answered "DIRECTV," and provides the gift card information. The fraudster immediately drains the card of the funds, and the consumer never receives the promised promotions.  Sometimes, the victims of the Imposter Fraud Scheme call DIRECTV customer care confused and angry; others recognize they have been scammed but, nonetheless, associate DIRECTV with the experience.

131093348.v1

5.    Unlike many fraudsters, who meet and share information and resources on the dark web, those engaged in imposter fraud scams may collect customer information on the dark web, but they connect and do business in Facebook groups, LinkedIn chats, and on employment sites such as Upwork.  They talk openly about needing a script, a gift card launderer, lists of customer information, and employees to run their scams, which they call "campaigns."  Examples of such communications are attached as **Exhibit A**. The fraudsters brag about their experience and expertise and highlight their specialties with particular imposter fraud scams.  *See id.*  While most call centers are located in Pakistan, many of the call center owners and the VoIP providers are located in the United States, like Defendants, as are the companies that ultimately cash out gift cards.

6.    Unfortunately, in the modern ecommerce world, imposter fraud has taken a sizeable leap, particularly in the last couple of years.  According to the FTC, consumer-reported fraud grew 70% between 2020 and 2021, for a total of $5.8 billion in consumer losses.  The FTC received over 2.8 million consumer reports of fraud in 2021 "with the most commonly reported category once again being imposter scams."  https://www.ftc.gov/news-events/news/press-releases/2022/02/new-data-shows-ftc-received-28-million-fraud-reports-consumers-2021-0.  In the first 9 months of 2021, consumers reported losing $148 million in gift card scams, like the one at issue here.  https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-data-show-major-increase-gift-cards-scam-payment-method.  There is no industry or government agency, and virtually no large, well-known company, which has not been the target of imposter fraud.  The Imposter Fraud Scheme aimed at DIRECTV and its customers has been the subject of warnings by the Better Business Bureau (https://www.youtube.com/watch?v=NkROaBAvaiE), news reports (https://abc11.com/scam-call-att-directv-im-calling-you-from/11079862/), and government investigations (*see* **Exhibit B**, Michigan Attorney General's Petition for Leave to Issue Civil Subpoenas to VoIP providers involved in DIRECTV imposter fraud).

7.     Since learning that fraudsters were using its name to defraud consumers, DIRECTV has taken steps to combat the extremely harmful Scheme.  For example, DIRECTV expends significant resources to respond to existing and potential customer complaints of imposter fraud scams.  In addition to attempting to rescue the relationships damaged by Defendants and their co-conspirators, DIRECTV collects and analyzes the data provided in customer reports of imposter fraud. DIRECTV also works with law enforcement, regulators, and industry groups to combat the Imposter Fraud Scheme.  It routinely posts and circulates fraud alerts for its customers and the public, in an effort to educate and encourage consumers to be alert to the potential dangers of fraud. Finally, DIRECTV also dedicated internal resources, hired investigators and retained the undersigned counsel to take legal action to pursue Defendants and others engaged in the Imposter Fraud Scheme.

8.     In addition to violating numerous state laws and common law rights of DIRECTV and its customers, in perpetrating the Imposter Fraud Scheme, Defendants are engaged in an unlawful enterprise to access DIRECTV's protected computer systems, traffic in protected and confidential computer passwords, willfully infringe DIRECTV's trademarks, and falsely impersonate and advertise as DIRECTV.

9.     The Imposter Fraud Scheme causes substantial harm to DIRECTV and its customers. In addition to the pecuniary losses and costs associated with addressing the Scheme, the misconduct by Defendants and their co-conspirators significantly harms DIRECTV's relationships with its customers and others.  For example, legitimate customers who are targeted by Defendants and their co-conspirators are distressed and blame DIRECTV, the company whose name Defendants co-opted in perpetrating their theft.  DIRECTV is also being forced to defend lawsuits, including Telephone Consumer Protection Act (TCPA) claims, based not on its own acts, but on Defendants' false

advertising, impersonation, and other unlawful acts.  Defendants are causing substantial financial losses as well as damage to DIRECTV's brand, image, and relationships.

10.    DIRECTV values its hard-earned reputation as a leading service provider in the digital entertainment industry and holds its customers in the highest regard.  Filing this lawsuit, and others like it, is an important aspect of DIRECTV's ongoing commitment to protect its brand and its customers from those that seek to profit from the illegal Imposter Fraud Scheme.

11.    DIRECTV seeks to recover damages for the ongoing harm it suffers as a result of Defendants' Imposter Fraud Scheme and to obtain an injunction prohibiting Defendants from continuing to engage in the Scheme.

12.    All conditions precedent to this action have been performed, waived or excused.

13.    DIRECTV has retained the undersigned attorneys to represent it in this action and has agreed to pay its attorneys a reasonable fee for their services.

## PARTIES, JURISDICTION, AND VENUE

14.    Plaintiff DIRECTV, LLC ("DIRECTV") is a California limited liability company, with its principal place of business in El Segundo, California.

15.    Defendant WNK Associates, Inc. a/k/a Trans Global Services a/k/a Switch 2 Us a/k/a DTV Promo ("Trans Global") is a Texas corporation with its principal place of business in Tyler, Texas.

16.    Defendant The Great Mile LLC ("Great Mile") is a Texas limited liability company with its principal place of business in Tyler, Texas.

17.    Defendant FDI Telecom Company ("FDI Telecom") is a New Jersey corporation with its principal place of business in Harrison, New Jersey.

131093348.v1

18.     Defendant Compliance Whiz Inc. ("Compliance Whiz") is a New Jersey corporation with its principal place of business in Harrison, New Jersey.

19.     Defendant Waleed Iqbal ("W. Iqbal") is an individual residing in Tyler, Texas.  W. Iqbal is the founder, president, and director of Trans Global, and is personally engaged in, and helps facilitate, the improper conduct described herein.

20.     Defendant Khalid Iqbal ("K. Iqbal") is an individual residing in Tyler, Texas.  Upon information and belief, K. Iqbal is an executive of Trans Global and W. Iqbal's father, and is personally engaged in, and helps facilitate, the improper conduct described herein.

21.     Defendant Motasim Billah ("Billah") is an individual residing in Tyler, Texas. Billah is the Managing Partner of Trans Global and Great Mile, and is personally engaged in, and helps facilitate, the improper conduct described herein.

22.     Defendant Shahid Bashir Ahmad a/k/a Muhammad Ahmad ("Ahmad") is an individual residing in Harrison, New Jersey.  Ahmad is a Trans Global employee and the Director of Sales and Operations for FDI Telecom, and is personally engaged in, and helps facilitate, the improper conduct described herein.

23.     Defendant Rana T. Rehman ("Rehman") is an individual residing in Harrison, New Jersey.  Rehman is the owner and director of FDI Telecom and the owner of Compliance Whiz, and is personally engaged in, and helps facilitate, the improper conduct described herein.

24.     Defendant Amna Jilani ("Jilani") is an individual residing in Harrison, New Jersey. Jilani is the director of Compliance Whiz, and is personally engaged in, and helps facilitate, the improper conduct described herein.

25.     Upon information and belief, yet to be identified Defendants John Does 1-10 are present and/or doing business in Texas, and are engaged in illicit conduct and business transactions

in the District of Texas as alleged herein.  The identities of the various John Doe defendants are not presently known and the Complaint will be amended to include the name or names of these individuals when such information becomes available.

26.    Upon information and belief, yet to be identified Defendants XYZ Companies 1-10, through their agents, servants, and employees are present and/or doing business in Texas, and are engaged in illicit conduct and business transactions in the District of Texas as alleged herein.  The identities of such Defendants XYZ Companies are not presently known and the Complaint will be amended to include the names of the actual defendants when such information becomes available.

27.    At all times relevant hereto, Defendants have failed to observe the corporate formalities required by law, have acted as a single entity, and have shared resources and corporate infrastructure, including, but not limited to computer services, telephone numbers, employees, and office space.  Accordingly, each Defendant is liable for the acts and omissions of every other Defendant pursuant to piercing of the corporate veil, among other legal principles.

28.    Each Defendant is the partner, joint venturer, accomplice, agent, and alter ego of each of the other Defendants.

29.    Each Defendant is equally liable in relation to the illegal activities described herein on the basis of Defendant's material participation in the Imposter Fraud Scheme.

30.    Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§1331 and 1338 because DIRECTV's claims for violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.* and the Computer Fraud and Abuse Act, 18 U.S.C. §1030, *et seq.* arise under federal law.  Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over DIRECTV's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

8

31.     Defendants are subject to the personal jurisdiction of this Court because they reside in Texas, regularly transact business in Texas, committed tortious acts in Texas, and, on information and belief, caused injury to individuals and/or businesses in Texas, thereby engaging in substantial and not isolated activities within Texas.

32.     Venue is proper pursuant to 28 U.S.C. §1391(b) because the Defendants reside in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

### DIRECTV'S BUSINESS MODEL

33.     DIRECTV provides its over 14 million customers with the choice of watching digital entertainment from virtually anywhere – on televisions at home, on computers using their streaming service, or on mobile devices via the DIRECTV mobile application. In addition to its basic channel lineup, DIRECTV offers, *inter alia*, On Demand titles, and premium channels. Customers tailor the programming packages to meet their needs and can pay for their DIRECTV service by debit card, credit card, or PayPal.

34.     In addition to being available online and through telesales, DIRECTV products and services are available through authorized DIRECTV dealers and retailers around the country. DIRECTV, its dealers and retailers, consumers, and those involved in the Scheme often refer to DIRECTV as DTV.  At one time, Defendant Trans Global was an authorized DIRECTV dealer but DIRECTV ended that relationship in August 2019 for suspicious marketing techniques.

35.     DIRECTV's business model is based upon the ability to deliver affordable quality products and services to consumers.  From time to time, DIRECTV provides financial incentives to attract new customers and retain current customers, *e.g.*, 3 free premium channels for 3 months. DIRECTV is able to recoup these incentives through revenue earned on the monthly services it

9

provides.  However, DIRECTV has never offered a promotion under which its customers can reduce the cost of their entertainment package by 50% or accepted retail gift cards in payment.

36.     DIRECTV's unique products and services, combined with its reputation and state-of-the-art technology, make it a target for the Imposter Fraud Scheme being conducted by Defendants' and their co-conspirators.

## DIRECTV'S TRADEMARK RIGHTS

37.     DIRECTV owns the standard character marks for DIRECTV® and GENIE® and several stylized marks (collectively, the "DIRECTV Marks").  A detailed chart summarizing DIRECTV's U.S. federal trademark registrations and applications for the DIRECTV Marks is attached as **Exhibit C**.[1]  The stylized DIRECTV marks are depicted below:



38.     DIRECTV uses the DIRECTV Marks on and in connection with its communications and entertainment products and services.

39.     As a result of the high quality and desirability of DIRECTV's products, services, sales, and the promotion and advertising thereof, the DIRECTV Marks have become an intrinsic

---

[1]  Copies of the Certificates of Registration (where applicable), TSDR status pages, and ownership status pages for the DIRECTV Marks issued by the United States Patent and Trademark Office are attached as **Composite Exhibit D.**

part of the valuable goodwill and property of DIRECTV. The DIRECTV Marks are well known and established to customers and the trade as symbols identifying and distinguishing DIRECTV's products and services, and signifying distinctive products and services of high quality. Only DIRECTV and its authorized, affiliated agents or partners are permitted to use the DIRECTV Marks. The DIRECTV Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with DIRECTV.

40.     As of August 2019, Defendants are not in any way or for any purpose affiliated with DIRECTV and, therefore, cannot lawfully use the DIRECTV Marks.

41.     As of August 2019, DIRECTV revoked any authority Defendants had to use the DIRECTV Marks in any way or for any purpose.

42.     DIRECTV has prior use of the DIRECTV Marks.

43.     Defendants' unlawful use of the DIRECTV Marks began after the Marks became famous and acquired distinctiveness.

## DEFENDANTS' MISCONDUCT

44.     Although each Defendant and co-conspirator may participate in less than all of the steps in the Imposter Fraud Scheme, they are necessarily reliant on their co-conspirators to complete and benefit from the Imposter Fraud Scheme. Therefore, every act by a Defendant and/or co-conspirator in furtherance of the conspiracy renders that Defendant or co-conspirator liable to DIRECTV for the harm caused by the entire Imposter Fraud Scheme.

45.     Defendants' Imposter Fraud Scheme includes the following bad actors:

    a.     **Lead List Generators and Traffickers**. Lead Lists are lists of purported DIRECTV customers, usually with personal information such as name, phone number, address, account number, balance, and any other information the generators are able to

131093348.v1

gather.  They collect this information in a number of ways, including social engineering, texts or calls to consumers, phishing emails and websites intended to lure consumers to submit their information, or scouring the dark web for relevant information.  Once the Lead List Generators gather a sufficient volume of data, they sell the lead lists to call centers.

b.      **Call Centers**.  Call Centers like Trans Global and Great Mile are the entities that utilize the Lead Lists to contact current and prospective DIRECTV customers.  The individuals at the Call Centers dial the numbers on the Lead List and follow a script to convince consumers to provide them with money – usually prepaid gift cards – in exchange for free or significantly discounted DIRECTV services or equipment.

c.      **Co-working/Portal Space**.  Some Call Centers do not have their own space from which to make calls.  Instead, they rent space in a facility dedicated to accommodating imposter scams.  A "co-working" facility provides the Call Center with a furnished room, computers, internet connection, and headsets.  A "portal" provides everything the co-working facility provides plus a "clean" IP address and Lead Lists—all the Call Center has to do is show up and have its team start dialing unsuspecting consumers.

d.      **Prepaid Gift Card Merchants**.  Once the Call Centers have convinced existing or prospective DIRECTV customers to provide them with prepaid gift cards, those cards are laundered through a Prepaid Gift Card Merchant.  The Prepaid Gift Card Merchant collects the card information, typically through a web interface or through an email or chat message, and provides payment to the Call Centers through PayPal, cryptocurrency, Western Union, Zelle, Moneygram, and similar electronic payment methods.  The Prepaid Gift Card Merchant can take as much as half of the amount being

laundered as a fee.  The Merchant then uses companies like PayPal, Authorize.net, and Elavon, to cash out the prepaid gift cards.

       e.     **VoIP Service Providers**.  VoIP service is essential to the Imposter Fraud Scheme.  VoIP allows Lead List Generators and Call Centers to dial U.S. consumers, even from overseas, at a *de minimis* cost, and to conceal and misrepresent their identities.  While some fraudsters may sidestep protocols implemented by well-meaning VoIP providers, other VoIPs intentionally turn a blind eye to Defendants and their co-conspirators exploiting their platform, and still others, like FDI Telecom and Compliance Whiz, purposefully service and profit from this fraud.

46.     Defendants and their co-conspirators are knowingly and willfully engaged in the Imposter Fraud Scheme.  Because of the nature of fraud schemes, the complete extent of Defendants' activities in the Imposter Fraud Scheme is not yet known, however, Defendants are actively involved in several integral components of the conspiracy.  Some of those components are discussed *infra*.

47.     Defendants Trans Global and owner W. Iqbal were authorized dealers of DIRECTV products and services until August 2019, at which time DIRECTV terminated the agreement based on suspicious telemarketing activities by Trans Global and W. Iqbal.  W. Iqbal made several attempts to once again become a DIRECTV dealer, submitting applications in which he attempted to hide his identity and provide false names, fictional companies, and even doctored photos.  His applications were denied.

48.     Upon termination, Trans Global and W. Iqbal were no longer authorized to use the DIRECTV Marks or offer DIRECTV services or products to existing or potential customers.  Even

while an authorized dealer, Trans Global and W. Iqbal were not permitted to represent themselves as DIRECTV, but were required to honestly identify themselves as a third party dealer.

49.     Undaunted by DIRECTV's refusal to be associated with Trans Global or W. Iqbal, Defendants continue, to this day, to erroneously advertise as DIRECTV or an authorized DIRECTV retailer or dealer, and use the DIRECTV Marks and lift information and photos directly from DIRECTV's website.  Representative examples of Defendants' false advertisements are attached hereto as **Exhibit E**.

50.     On or about April 6, 2022, DIRECTV became aware that phone number (844) 630-1138 was making Imposter Fraud Scheme calls to consumers.  The message left in voicemail stated: "Hi there I'm calling you from AT&T DIRECTV to let you know that your existing account is qualified for 50% off. In order to avail the discount [sic], kindly call us back at (844) 630-1138 from 8 am till 9 pm Pacific Standard Time. Thank you and have a great day."

51.     On April 7, 2022, a DIRECTV investigator called the phone number, which was answered: "Thank you for calling AT&T and DIRECTV, please press 1 for billing."  The investigator pressed "1."  A man picked up saying "Thank you for calling DIRECTV" and asked the investigator for a name, phone number, and DIRECTV account number and personal identification number (PIN).  The investigator provided information for a dummy account set up by DIRECTV to catch fraudsters.  The investigator was put on hold, the investigator's phone number was spoofed, and Defendants accessed the dummy account on DIRECTV's system using the information they had collected.

52.     "James" came back on the line and offered the investigator two-years of DIRECTV at $45/month but to be eligible, the investigator had to make an upfront payment of $540 in eBay gift cards.  According to James, the special promotion was the result of a collaboration between

14

DIRECTV and eBay.  James then provided the investigator with a list of recommended retail locations that sold eBay gift cards, including CVS, Target, Walgreens, Kroger, and Rite Aid, and he described the appearance of the cards in detail—including their color scheme.

53.     James provided the investigator with another number, (888) 478-5810, to contact with the gift card information.  He also provided his own "confirmation number": DTV516. (On information and belief, 516 is a tally of the successful DTV fraud calls completed that day or by that fraudster.)  James sweetened the deal with a $100 AT&T Visa Gift Card to be mailed out, if the investigator called back within 90 minutes.  The investigator asked James to confirm the mailing address for the AT&T Visa Gift Card, but James deflected.

54.     Upon learning that the investigator already had an eBay gift, James indicated that he could process the payment.  The investigator provided the card information and after a hold of only seconds, James came back on the line and stated that the balance on the card was zero and the investigator would have to purchase another card.

55.     Through research on fraud forums, DIRECTV's investigators were able to determine that the (888) 478-5810 phone number for the "payment processing department" provided by "James" was for Trans Global's Lahore, Pakistan call center.

56.     As DIRECTV further investigated Trans Global, it discovered that Trans Global also has call center locations in Karachi and Islamabad.

57.     Trans Global and W. Iqbal posted advertisements and business updates on social media, including photos of a celebration, purportedly in Pakistan, with W. Iqbal at the center, and a whiteboard in the background.  The whiteboard had the "Daily Sales Report," reflecting progress on "DTV" scams and providing a "call back number" for the "payment processing department" of (877)

420-5236, a number widely reported by consumers as perpetrating the Imposter Fraud Scheme. Copies of the photos are attached hereto as **Exhibit F**.

58.     The Trans Global (877) 420-5236 number is also associated with an active and fraudulent Facebook profile "Media Store," which offers DIRECTV services, using the AT&T globe logo in combination with the DIRECTV stylized name.  Copies of the Media Store advertisements are attached hereto as **Exhibit G**.

59.     The LinkedIn page for Trans Global Services in Pakistan provides a contact number of (213) 375-2333, which is a number for Texas company WNK Associates, Inc., incorporated and run by W. Iqbal, K. Iqbal, and Billah.

60.     W. Iqbal filed an Assumed Name Certificate of "Switch 2 Us" on August 19, 2016, and another Assumed Name Certificate for "DTV Promo" on December 16, 2019—months after DIRECTV terminated his dealer agreement.

61.     The current Facebook profile for WNK Associates falsely represents that it is an "AT&T Preferred Dealer" and includes photos taken directly from the DIRECTV website.  *See* **Exhibit    H**, WNK Associates' Facebook profile, available at https://www.facebook.com/wnkassociates.

62.     In his Facebook profile, W. Iqbal identifies himself as a director at WNK Associates, Inc. as well as being a director of notorious DIRECTV Imposter Scheme fraudster KM Communications Pvt. Ltd., a Pakistani company.

63.     On information and belief, K. Iqbal, who is the registered agent for Trans Global, assists his son, W. Iqbal, in running Trans Global and participates in furthering the Imposter Fraud Scheme.

16

64.     Billah is the self-proclaimed Managing Director of WNK Associates, as well as the "Authorized Representative," according to records of the Public Utility Commission of Texas.  He also identifies as the Managing Director for Trans Global Services and Great Mile, all of Tyler, Texas.  On information and belief, Billah is active in orchestrating and perpetrating Defendants' Imposter Fraud Scheme.

65.     Great Mile is the sister corporation to WNK Associates and, on information and belief, is being operated by Billah and W. Iqbal as part of "Trans Global" to further Defendants' Imposter Fraud Scheme.

66.     Despite being terminated as a DIRECTV dealer for questionable business practices, Trans Global and W. Iqbal are prolific advertisers of DIRECTV on many platforms and across numerous Imposter Fraud Scheme groups on Facebook.  Representations examples of Trans Global's and W. Iqbal's advertisements are attached hereto as **Exhibit I**.

67.     Continuing with its efforts to impersonate DIRECTV and defraud and alienate existing or potential DIRECTV customers, Trans Global also runs two websites, gennietv.us and gennietv.com, which sell consumers counterfeit DIRECTV HD DVR "Gennie" devices.  They have 16 FTC complaints as of today.

68.     Aggrieved consumers who were either duped or harassed by Defendants, masquerading as DIRECTV and offering the 50% off promo scam, are reporting it on public sites.  Representative examples of these consumer reports are attached as **Exhibit J**.

69.     Trans Global shared an address with Merchant Payment Systems and Total Payment Solutions, payment and credit card processing centers, which is a key requirement for the Imposter Fraud Scheme.  Call centers, like Trans Global, require card merchants to liquidate their fraudulently obtained gift cards.

70.     Ahmad is an executive at Trans Global, who is the contact resource for the Trans Global LinkedIn page, and is the owner of FDI, a New Jersey corporation that, on information and belief, provides essential VoIP services and supplemental call center services to Trans Global.  The VoIP services provided by FDI, a subsidiary of Pakistani company GroupFDI, allow Trans Global call center employees in Pakistan to mask their location, mimic DIRECTV, and quickly and cost-effectively contact consumers.  On information and belief, Ahmad is also the CEO of GroupFDI.

71.     Rehman is the sole director of FDI and Compliance Whiz, its sister company, and another subsidiary under GroupFDI.  On information and belief, Rehman is providing VoIP and call center services through his companies to further the Imposter Fraud Scheme.

72.     Compliance Whiz, which advertises "regulatory consulting services" for the Telecom industry has offices in Harrison, New Jersey, Pakistan, and the UAE.  On information and belief, Compliance Whiz is providing similarly essential VoIP services to Trans Global.

73.     Jilani is the sole director of Compliance Whiz and, on information and belief, is assisting Rehman to run the company and oversee its participation in and support of the Imposter Fraud Scheme.

74.     In June 2022, W. Iqbal was identified advertising on Upwork.  *See* **Exhibit K,** W. Iqbal's Upwork profile, available at https://www.upwork.com/freelancers/~01fce48da85f67164f. A DIRECTV investigator responded to the advertisement and inquired into Defendants' ability to run the Imposter Fraud Scheme.  W. Iqbal scheduled an online meeting for the investigator to talk with his employees, who confirmed their experience and expertise in running the Imposter Fraud Scheme.  W. Iqbal followed-up with a proposal that included, *inter alia*, Call Center and VoIP services and Lead Lists.  He indicated he would provide recommendations for merchants to launder the gift cards.

75.     Defendants and their co-conspirators utilize numerous individuals and companies throughout the United States and around the world to conduct their Imposter Fraud Scheme and, by the nature of a fraud scheme, their unlawful transactions are concealed.  As such, discovery in the United States and overseas, including third party depositions and other discovery, will be necessary to identify all of Defendants' co-conspirators, determine the extent of their unlawful activities, and to quantify the totality of harm they caused DIRECTV, its customers, and United States consumers.

### SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT

76.     Defendants' actions substantially harm DIRECTV in several ways, including *inter alia*: (1) Defendants' actions seriously and irreparably interfere with DIRECTV's relationships with its customers and others; (2) Defendants' false advertising and infringement of the DIRECTV name and DIRECTV Marks cause significant ongoing and irreparable losses and harm to DIRECTV's goodwill, image, and reputation; (3) DIRECTV is deprived of the opportunity to earn profits by providing products and services to legitimate DIRECTV customers; (4) Defendants' impersonation of DIRECTV has led to numerous baseless lawsuits, which DIRECTV has to defend; and (5) Defendants' misconduct and the harm it causes undermines DIRECTV's competitive position in the digital entertainment industry.

77.     In addition, Defendants' and their co-conspirators' Imposter Fraud Scheme results in calls, emails, and instant messaging by confused and angry consumers to DIRECTV's customer relations department.  DIRECTV incurs significant costs associated with responding to, investigating, and attempting to resolve customer relations issues created by Defendants.  In the process, DIRECTV loses customers or potential customers who responded to Defendants' fraudulent promotional offer, and its reputation suffers as a result.  DIRECTV also suffers irreparable harm when confused

consumers, relying on Defendants' and/or their co-conspirators' representations, look to DIRECTV to fulfill the promises made by Defendants and/or their co-conspirators.   The consumers victimized by Defendants and/or their co-conspirators look to DIRECTV to resolve their complaints, including reimbursing them for the money they lost or honoring the promotions Defendants and/or their co-conspirators promised.

78.   Defendants' continuing conduct results in substantial harm to DIRECTV's business reputation and goodwill; a greater likelihood of confusion, mistake, and deception as to the source of origin of DIRECTV products and services unlawfully advertised by Defendants; and confusion as to what, if any, relationship exists between DIRECTV and Defendants.

## COUNT ONE

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ADVANTAGE

79.   DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

80.   A business relationship and an expectancy of business relationships exists between DIRECTV and the purchasers and prospective purchasers of its DIRECTV products and services.

81.   There is a high probability of future economic benefit to DIRECTV from these current and prospective business relationships.

82.   Defendants know of, rely on, and intentionally and unjustifiably interfere with, current and prospective business relationships between DIRECTV and legitimate DIRECTV customers and prospective customers.

83.   Specifically, but without limitation, Defendants know that DIRECTV has business relationships, and an expectancy of business relationships, with legitimate consumers of DIRECTV products and services. It is the foundation of their Scheme.

84.     Defendants interfered with these relationships by engaging in their Imposter Fraud Scheme, which includes promising free or substantially-discounted DIRECTV products and services with no intention of providing said products or services.

85.     Defendants are intentionally interfering with DIRECTV's business relationships and prospective advantages through improper means and in violation of the law.

86.     Defendants engage in the acts of interference set forth herein with a conscious desire to prevent the relationships from occurring or continuing or Defendants knew that the interference was certain or substantially certain to occur as a result of their conduct.

87.     Defendants' acts continue to injure DIRECTV's business relationships.

88.     DIRECTV has been and continues to be proximately damaged as a result of Defendants' interference with its existing or potential customer relationships.

89.     There is no adequate remedy at law to fully compensate DIRECTV for the harm caused by Defendants' tortious interference.

**COUNT TWO**

**TORTIOUS INTERFERENCE WITH CONTRACT**

90.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

91.     A contractual relationship exists between DIRECTV and its customers, the purchasers of its DIRECTV products and services.  The contract requires, in part, DIRECTV's customers to pay an agreed-upon monthly fee for the products and/or services provided by DIRECTV.

131093348.v1

92.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these contracts between DIRECTV and legitimate DIRECTV customers.

93.     Defendants and their co-conspirators rely on and exploit the contractual relationship between DIRECTV and its customers to unlawfully obtain money and/or prepaid gift cards based on the false promise of discounted or free DIRECTV products or services.  Defendants interfered with these relationships by engaging in the Imposter Fraud Scheme and causing DIRECTV customers to doubt or resent their relationship with DIRECTV and to terminate their agreements with DIRECTV.

94.     Defendants engaged in the acts of unjustifiable interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct, defrauding DIRECTV customers under the guise of DIRECTV.

95.     Defendants' acts are not motivated by legitimate business reasons.

96.     DIRECTV has been proximately damaged and continues to be damaged by Defendants' interference.

97.     There is no adequate remedy at law to fully compensate DIRECTV for the harm caused by Defendants' tortious interference.

## COUNT THREE

## CIVIL CONSPIRACY

98.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

131093348.v1

99.     An agreement and conspiracy existed and continues to exist between and among Defendants and other co-conspirators to:

    a.     impersonate DIRECTV;

    b.     contact existing or potential DIRECTV customers to offer them free or significantly discounted products or services in exchange for money or prepaid gift cards (knowing that no services or products will be provided); and

    c.     launder the prepaid gift cards into cash.

100.    Defendants' actions constitute unfair competition, tortious interference with business relationships and prospective advantage, tortious interference with contract, unjust enrichment, trademark infringement, false advertising, and violation of the federal Computer Fraud and Abuse Act, among other things.

101.    Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy, as set forth with more particularity *supra*.

102.    DIRECTV has been and continues to be proximately damaged by the conspiracy and Defendants' actions in furtherance thereof.

103.    There is no adequate remedy at law to fully compensate DIRECTV for the harm caused by Defendants' conspiracy.

**<u>COUNT FOUR</u>**

**UNJUST ENRICHMENT**

104.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

105.    By masquerading as DIRECTV and using at least one of the DIRECTV Marks to unlawfully sell DIRECTV products and services, Defendants have obtained benefits from

DIRECTV that cause significant harm to DIRECTV and result in significant financial gain to Defendants.

106.    Defendants have acquired the benefits of impersonating DIRECTV voluntarily and with full knowledge of and intent to reap those benefits.

107.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying DIRECTV the value of the benefits Defendants acquired.

108.    There is no adequate remedy at law to fully compensate DIRECTV for the harm caused by Defendants' unjust enrichment.

<u>**COUNT FIVE**</u>

**UNFAIR COMPETITION**

109.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

110.    Defendants have and continue to enrich themselves by impersonating DIRECTV, contacting existing or potential DIRECTV customers, offering free or significantly discounted DIRECTV services or products, taking their money or prepaid gift cards, and failing to provide the promised DIRECTV services or products, which constitutes unfair competition under the common law of the State of Texas.

111.    Defendants' conduct and participation in the Imposter Fraud Scheme constitutes unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in violation of State law.

112.    Defendants' use of at least one of the DIRECTV Marks in connection with the Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and

deception as to the source of origin of Defendants' products and services, and the relationship between DIRECTV and Defendants. Thus, Defendants have also engaged in unfair competition with DIRECTV by selling and/or offering, and promoting their products and services with the intention of trading upon the goodwill established by DIRECTV and are thereby misappropriating the benefits of substantial effort and money expended by DIRECTV in establishing DIRECTV's rights in and to the DIRECTV Marks.

113.     Defendants' conduct complained of herein was and continues to be intentional, malicious, and willful, and has caused substantial harm to DIRECTV.

114.     There is no adequate remedy at law to fully compensate DIRECTV for the harm caused by Defendants' unfair competition.

## COUNT SIX

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

115.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

116.     DIRECTV has the following computers: (1) DIRECTV password protected ordering system; (2) DIRECTV national communications and computer networks; and (3) DIRECTV electronic customer account and billing portal (collectively, "Protected Computers"). The Protected Computers are "computers" as that term is defined in Section 1030(e)(1) of the Computer Fraud and Abuse Act because they are electronic and/or high speed data processing devices performing logical, arithmetic, or storage functions, and include data storage facilities and/or communications facilities directly related to or operating in conjunction with such devices.

117.    DIRECTV prevents unauthorized access to its Protected Computers through, among other things, the confidential codes/passwords needed to access the Protected Computers ("Security Codes").

118.    Defendants and/or their co-conspirators obtain these Security Codes through various unlawful means, including the Dark Web, social engineering, and identity theft.

119.    Through their Imposter Fraud Scheme, Defendants are knowingly trafficking in the Security Codes with the intent to defraud and harm DIRECTV.

120.     Defendants and their co-conspirators use the fraudulently-obtained Security Codes to gain unauthorized access to at least one of DIRECTV's Protected Computers (*i.e.*, using Security Codes fraudulently obtained from third party sources like the Dark Web, social engineering, and identity theft to log into DIRECTV password protected ordering systems and/or the DIRECTV electronic customer account and billing portal to make changes to a customer's DIRECTV account).  This access into at least one of DIRECTV's Protected Computers is not authorized in any way.  Defendants or their co-conspirators share these Security Codes among themselves and with their co-conspirators.

121.    Defendants' transfer of the Security Codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the Security Codes were transferred, or otherwise disposed of, to others, or Defendants obtained control of the codes with intent to transfer or dispose of them.

122.    Defendants' trafficking of the Security Codes substantially affects interstate commerce and communication in that the Security Codes are trafficked over the Internet, throughout the United States, and around the world, and DIRECTV's Protected Computers are used in and affect interstate commerce and communication.

131093348.v1

123.     Defendants' unlawful trafficking of DIRECTV's Security Codes has caused and will continue to cause DIRECTV to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

124.     With respect to loss, DIRECTV has spent well in excess of $5,000 over a one-year period assessing its Protected Computers for damage and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

125.     Also with respect to loss, DIRECTV has spent well in excess of $5,000 over a one-year period, investigating Defendants' intrusions into DIRECTV's Protected Computers, assessing the possible impairment to the integrity of its Protected Computers and conducting damage assessments regarding Defendants' collection and dissemination of Security Codes.

126.     Moreover, with respect to loss, DIRECTV has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identities and/or the method by which Defendants access DIRECTV's Protected Computers without authorization.

127.     With respect to damage, by unlawfully accessing DIRECTV's Protected Computers and collecting and disseminating the illegally acquired Security Codes, Defendants and their co-conspirators have substantially impaired the integrity of DIRECTV's Protected Computers in an amount in excess of $5,000.  Moreover, Defendants' actions have impaired DIRECTV's means of controlling the quality of its products and services.

128.     Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

129.     Defendants' conduct is intentional, malicious, fraudulent, and willful.

131093348.v1

130.     Pursuant to 18 U.S.C. § 1030(g), DIRECTV is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to DIRECTV and DIRECTV customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT SEVEN

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

131.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 and 116-131 as though fully set forth herein.

132.     DIRECTV's Protected Computers are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

133.     DIRECTV's Protected Computers hold confidential information, are connected to the Internet, and assist in providing federally-regulated communications services.

134.     In furtherance of their Imposter Fraud Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to access at least one of DIRECTV's Protected Computers.  As such, Defendants' access to DIRECTV's Protected Computers using fraudulently obtained credentials or identities is not authorized in any way.  Further, in using fraud or deception to access customer accounts and/or DIRECTV's billing systems, Defendants' and/or their co-conspirators' access into at least one of DIRECTV's Protected Computers is unauthorized.

135.     Defendants' unauthorized access of DIRECTV's Protected Computers has caused and will continue to cause DIRECTV to suffer injury, with "damages" and "losses" – as those terms are

defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-year period.

136.     Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

## COUNT EIGHT

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. §1030(a)(4)

137.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 and 116-136 as though fully set forth herein.

138.     Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access into at least one of DIRECTV's Protected Computers.

139.     Defendants and their co-conspirators obtain monetary value through their unlawful access into at least one of DIRECTV's Protected Computers.

140.     Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030(a)(4).

## COUNT NINE

### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. 1114 [§32(1) of the Lanham Act]

141.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

142.     Defendants' aforementioned conduct constitutes use of certain federally registered DIRECTV® Marks without authorization, in connection with their Imposter Fraud Scheme.

143.     Defendants' use of certain federally registered DIRECTV® Marks in connection with their Imposter Fraud Scheme has caused, and will continue to cause, a likelihood of confusion,

mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between DIRECTV and Defendants.

144.    Defendants' unauthorized use of certain federally registered DIRECTV® Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of DIRECTV.

145.    Defendants' use of certain federally registered DIRECTV® Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of DIRECTV's distinguishing and identifying federally registered trademarks that were created as a result of significant effort and expense by DIRECTV over a long period of time.

146.    Defendants' use of certain federally registered DIRECTV® Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with DIRECTV.  It is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by DIRECTV.

147.    Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, DIRECTV and the reputation and goodwill of DIRECTV, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of DIRECTV.

148.    DIRECTV is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

149.    Defendants' aforesaid acts constitute willful infringement of DIRECTV's aforementioned federally registered trademarks in violation of 15 U.S.C. §1114.

30

150.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, DIRECTV's lost profits, Defendants' gross profits, and DIRECTV's attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

## COUNT TEN

### FEDERAL COMMON LAW TRADEMARK INFRINGEMENT
### AND FALSE ADVERTISING
### 15 U.S.C. § 1125 (a)(1)(A) and (B) [§43(a) of the Lanham Act]

151.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

152.    Defendants' aforementioned conduct constitutes use of at least one of the DIRECTV Marks without authorization in connection with their Imposter Fraud Scheme.

153.    Defendants' use of at least one of the DIRECTV Marks in connection with their Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between DIRECTV and Defendants.

154.    Defendants' unauthorized use of at least one of the DIRECTV Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of DIRECTV.

155.    Defendants' use of at least one of the DIRECTV Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of DIRECTV's distinguishing and identifying trademarks that were created as a result of significant effort and expense by DIRECTV over a long period of time.

31

156. Defendants' use of at least one of the DIRECTV Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with DIRECTV. It is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by DIRECTV.

157. Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, DIRECTV and the reputation and goodwill of DIRECTV, and have been unjustly enriched and will continue to unjustly enrich themselves at DIRECTV's expense.

158. DIRECTV is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

159. Defendants' use of at least one of the DIRECTV Marks in commercial advertising and/or promotion misrepresents the nature, characteristics, and/or qualities of their infringing products and/or services. Such advertising and/or promotion is false and/or misleading and deceives, or has the capacity to deceive, consumers. The deception and misrepresentations have a material effect on purchasing decisions and affect interstate commerce.

160. Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B).

161. Defendants knew or should have known that they have no legal right to use the DIRECTV Marks.

162. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an

131093348.v1

award of, *inter alia*, DIRECTV's lost profits, Defendants' gross profits, and DIRECTV's attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

<u>COUNT ELEVEN</u>

**CONTRIBUTORY TRADEMARK INFRINGEMENT**

163.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

164.    By misappropriating and using at least one of the DIRECTV Marks, Defendants knowingly aid and enable distributors and/or sellers of their products and services to market them to members of the general public in a way that infringes the DIRECTV Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

165.    Defendants' unlawful, unauthorized, and unlicensed advertising and/or sale of DIRECTV products and services has contributed to the creation of express and implied misrepresentations that the products and services sold by Defendants and/or their co-conspirators, were created, authorized or approved by DIRECTV.

166.    Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers in the United States who purchase products or services from Defendants or their co-conspirators to believe that they are purchasing legitimate DIRECTV products or services.

167.    Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious and willful.

168.     DIRECTV has been damaged and continues to suffer damages as a result of Defendants' actions.

169.    There is no adequate remedy at law to fully compensate DIRECTV for the harm caused by Defendants' actions.

170.     DIRECTV is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

171.     Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, DIRECTV's lost profits, Defendants' gross profits, and DIRECTV's attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT TWELVE**

**FEDERAL TRADEMARK DILUTION**
**15 U.S.C. § 1125 (c) [Lanham Act §43(c)]**

172.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

173.     The DIRECTV Marks are distinctive and famous marks within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

174.     The DIRECTV Marks are famous throughout Texas and the United States.

175.     The DIRECTV Marks became distinctive and famous prior to the Defendants' use of their infringing marks and acts as alleged herein.

176.     Defendants' acts as alleged herein have diluted and will, unless enjoined, continue to dilute and are likely to dilute the distinctive quality of DIRECTV's famous Marks.

177.     Defendants' acts as alleged herein have tarnished and will, unless enjoined, continue to tarnish, and are likely to tarnish DIRECTV's Marks by undermining and damaging the valuable goodwill associated therewith.

178.     Defendants' acts as alleged herein are intentional and willful in violation of Section 43(c)(1) of the Lanham Act.

34

179.    DIRECTV is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

180.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, DIRECTV's lost profits, Defendants' gross profits, and DIRECTV's attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

## COUNT THIRTEEN

### FEDERAL TRADEMARK COUNTERFEITING
### 15 U.S.C. § 1114 [Lanham Act § 32(a)]

181.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

182.    DIRECTV has an incontestable federally registered trademark for GENIE® for use on the following goods: set-top boxes; digital video recorders and players; computer-operating software for use with set-top boxes and digital video recorders and players.

183.    Defendants are using in commerce a reproduction, counterfeit, copy, or colorable imitation of DIRECTV's GENIE® mark in connection with the sale, offering for sale, distribution and/or advertising of their counterfeit GENNIE set-top boxes and related services in a manner that is likely to cause confusion, mistake, and deception, leading the public to believe, falsely, that Defendants' products and services, and the products and services advertised by Defendants are the products and services of DIRECTV, or are sponsored, endorsed, licensed, or approved by DIRECTV, or are in some way connected with DIRECTV.

131093348.v1

184.    Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, DIRECTV and the reputation and goodwill of DIRECTV, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of DIRECTV.

185.    DIRECTV is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

186.    Defendants' aforesaid acts constitute willful trademark counterfeiting in violation of 15 U.S.C. §1114.

187.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, DIRECTV's lost profits, Defendants' gross profits, and DIRECTV's attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

188.    DIRECTV is entitled to statutory damages up to $2,000,000 per mark per type of counterfeit goods or services, sold, offered for sale, or distributed.

## **COUNT FOURTEEN**

### **VIOLATION OF ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT
15 U.S.C. § 1125(d)**

189.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

190.    Defendants have registered, trafficked in and/or used the following domain names that are virtually identical and confusingly similar to DIRECTV's GENIE® mark: (a) https://gennietv.com and (b) https://gennietv.us (collectively, the "Infringing Domains").

191.    DIRECTV'S GENIE® mark was in use, federally registered, and famous before the Infringing Domains were registered by Defendants.

192.     Defendants have registered, trafficked in and/or used the Infringing Domains in a manner that has diluted and will continue to dilute the distinctive quality of DIRECTV's famous GENIE® mark.

193.     Defendants registered and are using the Infringing Domains in bad faith with an intent to profit from their unlawful uses.

194.     Defendants' aforesaid acts constitute willful violations of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. §1125(d).

195.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, DIRECTV and the reputation and goodwill of DIRECTV, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of DIRECTV.

196.     DIRECTV is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

197.     Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, DIRECTV's lost profits, Defendants' gross profits, and DIRECTV's attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

198.     DIRECTV is entitled to statutory damages up to $200,000 for the Infringing Domains.

## COUNT FIFTEEN

## COMMON LAW TRADEMARK INFRINGEMENT

199.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

131093348.v1

200.    Defendants' aforementioned conduct constitutes use of at least one of the DIRECTV Marks without authorization in connection with their Imposter Fraud Scheme.

201.    Defendants' use of at least one of the DIRECTV Marks in connection with their Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between DIRECTV and Defendants.

202.    Defendants' unauthorized use of at least one of the DIRECTV Marks is likely to continue in the future, all to the great and irreparable damage to DIRECTV.

203.    Defendants' use of at least one of the DIRECTV Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of DIRECTV's distinguishing and identifying trademarks that were created as a result of significant effort and expense by DIRECTV over a long period of time.

204.    Defendants' use of at least one of the DIRECTV Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products, services, and business of Defendants have some connection, association or affiliation with DIRECTV.  It is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by DIRECTV.

205.    Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, DIRECTV and the reputation and goodwill of DIRECTV, and have been unjustly enriched and will continue to unjustly enrich themselves at DIRECTV's expense.

206.    DIRECTV is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

131093348.v1

207.    Defendants' activities constitute common law trademark infringement under the State of Texas.

208.    Defendants knew or should have known that they have no legal right to use the DIRECTV Marks.

209.    DIRECTV is entitled to exemplary and punitive damages by reason of Defendants' willful, reckless, deliberate and intentional conduct.

## COUNT SIXTEEN

### COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION

210.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

211.    As part of the Imposter Fraud Scheme, each of the Defendants, directly or indirectly through co-conspirators, regularly and systematically misrepresents and makes fraudulent statements to DIRECTV that they are legitimate DIRECTV account holders or other persons authorized to access legitimate DIRECTV customer accounts.

212.    The nature of the Scheme requires Defendants to make false representations to both DIRECTV and its customers.  In each instance, to add credibility to their Scheme, after deceiving DIRECTV customers into providing their confidential account information, Defendants transmit that information to DIRECTV, posing as the customer or a legitimately authorized representative of the customer.

213.    For example, on April 7, 2022, Trans Global, masquerading as DIRECTV, obtained account information from the investigator and then, impersonating the customer, provided that information to DIRECTV.  Additional examples of Defendants fraudulent misrepresentations are discussed *supra*.

214.     On information and belief, each Defendant participated in defrauding DIRECTV and its legitimate customers to conduct the Imposter Fraud Scheme.

215.     Defendants intend for DIRECTV to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators.

216.     DIRECTV's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable under the circumstances, namely, because Defendants had the account verification information that allowed them to access one or more of DIRECTV's Protected Computers for improper purposes.

217.     DIRECTV has been damaged and continues to suffer damages as a result of Defendants' actions.

218.     There is no adequate remedy at law to fully compensate DIRECTV for the harm caused by Defendants' fraud.

**COUNT SEVENTEEN**

**INJURY TO BUSINESS OR REPUTATION; DILUTION OF TRADEMARKS**
**Tex. Bus. & Com. Code Ann. § 16.103**

219.     DIRECTV reasserts the allegations set forth in Paragraphs 1-78 as though fully set forth herein.

220.     DIRECTV is the lawful owner of the DIRECTV Marks, which are famous in the State of Texas.

221.     DIRECTV's Marks became famous long before Defendants began using them.

222.     Defendants and/or their co-conspirators are not authorized to use the DIRECTV Marks and Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of the DIRECTV Marks without authorization.

131093348.v1

223.    Defendants' use of at least one of the DIRECTV Marks without authorization in connection with their Imposter Fraud Scheme.

224.    Defendants' and/or their co-conspirators' use of certain DIRECTV Marks in connection with the Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products and services, and the relationship between DIRECTV and Defendants.

225.    Defendants' and/or their co-conspirators' unauthorized use of certain DIRECTV Marks has caused and will continue to cause dilution of the distinctive quality of the DIRECTV Marks.

226.    Defendants, in committing the foregoing acts in commerce, have tarnished, and will continue to tarnish, DIRECTV and its reputation and goodwill, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of DIRECTV.

227.    DIRECTV is without an adequate remedy at law to redress such acts and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

228.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, DIRECTV's lost profits, Defendants' gross profits, treble damages, and DIRECTV's attorneys' fees.

## COUNT EIGHTEEN

### HARMFUL ACCESS BY COMPUTER
### Tex. Civ. Prac. & Rem. Code § 143.001, et seq.

229.    DIRECTV reasserts the allegations set forth in Paragraphs 1-78 and 116-140, as though fully set forth herein.

131093348.v1

230. Without DIRECTV's consent, Defendants unlawfully accessed at least one of DIRECTV's Protected Computers using fraudulently obtained credentials or identities.

231. Defendants unlawfully accessed at least one of DIRECTV's Protected Computers to obtain property by deceitful means.

232. Defendants unlawfully accessed at least one of DIRECTV's Protected Computers to delete and/or remove certain data from at least one of DIRECTV's Protected Computers.

233. Defendants unlawfully accessed at least one of DIRECTV's Protected Computers to obstruct, interrupt, and/or interfere with DIRECTV's use of certain computer programs and/or data.

234. Defendants unlawfully accessed at least one of DIRECTV's Protected Computers to alter, damage, and/or cause a malfunction of DIRECTV's Protected Computers and/or computer programs.

235. Defendants' conduct is intentional, malicious, fraudulent, and willful.

236. Defendants' activities injured DIRECTV, its reputation, and its property, including its Protected Computers.

237. DIRECTV is entitled to appropriate relief, as requested hereinafter, including compensatory damages and attorney's fees.

## DEMAND FOR JURY TRIAL

DIRECTV demands a trial by jury on all triable issues.

## REQUEST FOR RELIEF

WHEREFORE, DIRECTV requests that the Court enter the following relief:

(a)    judgment against Defendants and in favor of DIRECTV on all claims;

(b)    a finding that Defendants' acts and participation in the Scheme was willful, intentional, and/or in malicious disregard of DIRECTV's lawfully protected rights;

131093348.v1

(c)      an order awarding DIRECTV its compensatory, consequential, statutory, special, treble, exemplary, and punitive damages including, without limitation, its lost profits, loss of goodwill, and damage to its reputation, cost of corrective advertising, Defendants' gross profits, as provided by law, together with pre and post-judgment interest;

(d)      an order directing the forfeiture and cancellation of the Infringing Domains, or alternatively, transfer of the Infringing Domains to DIRECTV;

(e)      a preliminary and, thereafter, permanent injunction that includes, but is not limited to, enjoining Defendants and all of their past and present agents, officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, companies, agents, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for them or on their behalf, including, but not limited to, any corporation, partnership, proprietorship or entity of any type that is affiliated or associated with Defendants or Defendants' representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants who receive notice of the injunction from:

> i.      engaging in or soliciting, directing, requesting, or facilitating others to engage in the conduct described in the Complaint as the Imposter Fraud Scheme against DIRECTV and its actual and potential customers;

> ii.     holding themselves out as being associated with, employed by or on behalf of, or acting as an agent, representative, affiliate, contractor or authorized partner of DIRECTV or facilitating or knowingly assisting other persons or entities to do so;

iii.    contacting existing or potential DIRECTV customers by phone, email, text message, voicemail or any other method with the intent to engage in any aspect of the Imposter Fraud Scheme;

iv.    acquiring, advertising or reselling any DIRECTV products or services;

v.    attempting to or accessing DIRECTV's Protected Computer System – as defined in the Complaint – including through protected and confidential computer passwords obtained by defrauding consumers, purchasing or otherwise acquiring the information on the dark web or by any other illicit means;

vi.    acquiring, purchasing, selling, advertising, aggregating, supplying, and/or soliciting, directly or indirectly, actual or potential DIRECTV customer information or the confidential codes/passwords needed to access DIRECTV's Protected Computers;

vii.    communicating with employees or representatives of DIRECTV, whether in person, by phone, through a website or via a third party;

viii.    advertising for, soliciting or compensating individuals to engage in the Imposter Fraud Scheme;

ix.    training, educating, coaching, guiding, or instructing anyone on methods to defraud DIRECTV or its actual or potential customers;

x.    misappropriating that which rightfully belongs to DIRECTV, its customers, or potential customers, or in which DIRECTV or its customers or potential customers have an interest;

xi.    using the DIRECTV Marks, DTV, or any other trademark, service mark, trade name and/or trade dress owned or used by DIRECTV or its subsidiaries,

44

parents, and affiliates now or in the future, or that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the DIRECTV's Marks or DTV, without DIRECTV's prior written authorization;

xii.   engaging in any activity that infringes DIRECTV's rights in or is likely to dilute the distinctiveness of the DIRECTV Marks or DTV abbreviation;

xiii.   engaging in unfair competition with DIRECTV;

xiv.   using the Infringing Domains or any other confusingly similar domain names;

xv.   making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) Defendants' products or services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with DIRECTV, or (ii) DIRECTV's products or services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with Defendants;

xvi.   using, or authorizing any third party to use, in connection with business, goods or services, a false description, representation or designation of origin, or any marks, names, words, symbols, devices or trade dress that falsely associates such business, goods, and/or services with DIRECTV, or tends to do so; and

xvii.   Receiving any compensation, directly or indirectly, whether in money, in kind, or otherwise, for any of the acts proscribed in subparagraphs (x) – (xvii) above;

(f)      an order requiring Defendants to remove online offers of and deliver to DIRECTV all products, labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Defendants, bearing the infringing GENNIE mark or the DIRECTV Marks or any

reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same;

(g)      an order requiring Defendants, their agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants to engage in corrective advertising, as necessary;

(h)      an award of statutory damages to DIRECTV of $2,000,000 for Defendants' trademark counterfeiting and $200,000 for violation of the Anti-Cybersquatting Consumer Protection Act;

(i)      an order finding that this is an exceptional case under the Lanham Act;

(j)      an order awarding DIRECTV its costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a) and any other applicable provision of law; and,

(k)      such other or further relief as the Court may deem just and proper.

Respectfully submitted this 1st day of November, 2022.

**CARLTON FIELDS, P.A.**


By: */s/ Gail Podolsky*
      Gail Podolsky
      Georgia Bar No. 142021
      Email: gpodolsky@carltonfields.com
      1201 West Peachtree Street, Suite 3000
      Atlanta, GA  30309
      Tel:   (404) 815-3400
      Fax:   (404) 815-3415

      Stacey K. Sutton
      Florida Bar No. 289530
      Email: ssutton@carltonfields.com
      1025 Thomas Jefferson Street, NW
      Suite 400 West
      Washington, DC  20007-5208
      Tel:   (202) 965-8100
      Fax:   (202) 965-8104

131093348.v1

Aaron S. Weiss
Florida Bar No.  48813
Email: aweiss@carltonfields.com
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida  33136-4118
Tel:  (305) 530-0050
Fax:  (305) 530-0055

**_Attorneys for DIRECTV, LLC_**

47